Jan SKLENAR, Plaintiff,

v.

**The CENTRAL BOARD OF EDUCATION OF the SCHOOL DISTRICT OF the CITY OF DETROIT, Defendant.**

Civ. A. No. 6–70415.

United States District Court,
E. D. Michigan, S. D.

Sept. 11, 1980.

James T. Lafferty, Birmingham, Mich., for plaintiff.

Ulysses W. Boykin, Detroit, Mich., for defendant.

## OPINION

FEIKENS, Chief Judge.

This suit alleges that defendant Board of Education has violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e *et seq.*, insofar as the act prohibits an employer from discriminating against employees on the basis of national origin [1].

Plaintiff Jan Sklenar is a native of Czechoslovakia and has been employed by defendant as a teacher since 1957. (Stipulated Facts, Joint Pretrial Statement). Since 1971 he has also been head of the Social Studies Department at Chadsey High School. (1979 Tr 258). On May 19, 1975 he filed a complaint with the Michigan Civil Rights Commission and the Equal Employment Opportunity Commission, alleging that he had been denied promotions because of his national origin. On November 26, 1975 the United States Department of Justice issued plaintiff a notice of right to sue and plaintiff brought this suit on February 27, 1976.

Plaintiff brought this suit as both an individual action on his own behalf and a class action on behalf of defendant's employees of Slavic national origin. On August 2, 1977 I certified the plaintiff class, pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure; the class is defined in the order of certification as:

1) All past and present employees of defendant who are of Slavic national origin;

---

1. 42 U.S.C. Section 2000e-2.

   (a) It shall be an unlawful employment practice for an employer—

   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . .

2) A person of Slavic national origin is a person whose origins are either Czechoslovakian, Polish, Russian, Bylo–Russian, Ukranian, Slovakian, Balkan or Yugoslavian;

3) To be included in said class the employee must bear a surname of one of the countries listed above, and;

4) Must themselves have been born or must have had at least one parent or grandparent born in one of the above–listed Slavic countries;

5) A Slavic surname is a name which, in the respective Slavic languages, translates to meaning, i. e., plaintiff Sklenar's surname in Czechoslovakian translates to "a glazier", or "one who works with glass";

6) The definition of the class does not include people who, by reason of marriage or name change, no longer bear such a surname.

The order also appointed plaintiff Sklenar to represent the class[2].

The class action alleges discrimination in promotions to administrative positions in the school system. It was brought largely because defendant had not been responsive to requests by representatives of Slavic community groups in Detroit that defendant appoint more Slavic persons to administrative positions[3]. As framed, the action presented complex legal and factual issues and appeared initially particularly amenable to resolution by the parties[4].

**2.** Defendant contends that the plaintiff class should be modified or dissolved because the class as defined does not constitute a "national origin group". (Dft's Proposed Findings, p. 8; Joint Pretrial Statement, p. 11a). The argument defendant raises was considered by me at the time I certified the class. The issues of class definition and certification were thoroughly briefed and argued at that time and, since no new evidence or arguments are submitted, I find no reason to amend my order of August 2, 1977.

**3.** At trial plaintiff presented a great deal of evidence on a succession of meetings from 1971 to 1976 between representatives of Slavic community groups and the Board of Education or members of the Board. Defendant's response to these meetings ranged from promises

The parties thus attempted to reach a settlement and these efforts continued after the trial began on November 1, 1978. After two days of trial, I adjourned further proceedings at the parties' request while the parties continued settlement negotiations. The attempts to resolve the lawsuit out–of–court, even though protracted, were eventually unsuccessful. The trial was resumed on November 26, 1979, and continued through December 10, 1979. Final arguments were presented on April 16, 1980.

### The Individual Claim

### I. The Prima Facie Evidence

The pattern of proof in a Title VII case is well established. "The complainant in a Title VII trial must carry the initial burden under the statute of establishing a *prima facie* case of . . . discrimination." *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1972). In order to meet this burden, plaintiff must show "actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on discriminatory criterion illegal under the Act.'" *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1977). If plaintiff establishes a *prima facie* case of illegal discrimination, the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the actions

to look into the matter (1978 Tr 81), to outright rejection (1978 Tr 95), to no response whatsoever (1978 Tr 88). (See also Plt's Exhibits 4–7, 9).

**4.** By Mr. Lafferty (counsel for plaintiff):

MR. LAFFERTY: . . . I have felt right along that this is a situation which should be amenable of solution, because I think it is a difficult situation for everyone to grapple with.

From my client's point of view, there has been frustration over having the recognition of this problem, many times they thought they were going to get recognition in, perhaps, personnel changes or whatever, and that has been lost in the shuffle.

(1979 Tr 252)

taken towards the employee. *McDonnell Douglas, supra*, 411 U.S. at 802, 93 S.Ct. at 1824.

In this case plaintiff attempts to establish a *prima facie* case by showing that he applied for various administrative positions for which defendant was seeking applicants, and, although qualified, he did not obtain the positions he applied for[5]. He testified that since becoming employed as a teacher in 1957, he applied for nine positions; he said he was successful in only one such application. My findings regarding each position follow.

Plaintiff testified that in 1961 he applied for the position of Division Director of the Social Studies Department[6]. (1979 Tr 271). The position was publicized by a posted announcement. (Dft's Ex. 3). Plaintiff was not promoted to the position; he testified that he did not receive any response to his application from defendant. (1979 Tr 274). Defendant contends that plaintiff was not considered eligible for the position because he did not submit any information showing that as of 1961 he had

> Experience as a directing teacher or department head, assistant principal, or principal in varied situations either at the elementary or secondary level,

which was one of the posted qualifications for the position. (Dft's Ex. 3). The evidence on this point is contradictory and inconclusive. Defendant bases its claim that plaintiff's application did not show

that he had this experience on the fact that no candidate folder for plaintiff for the position was found in defendant's files. (1979 Tr 77–78). Plaintiff contends that he had the requisite experience because he had been "director" of a gymnasium in Czechoslovakia in the 1940's, and that he indicated this experience on his application. (1979 Tr 377). Neither party substantiated its claim by presenting a copy of the application. The only pertinent documentary evidence is plaintiff's personnel file (Plt's Ex. 40), which may have been reviewed in 1961 to determine whether plaintiff met the qualifications for the position. (1979 Tr 76). There is nothing in plaintiff's personnel file, including his application for teacher in 1957, which indicates that plaintiff had been the "director" of a gymnasium in Czechoslovakia. Plaintiff has not established that he submitted documentation which indicated that he was qualified for Division Director. Thus, no *prima facie* case has been shown as to this position.

Plaintiff testified that in 1964 he applied for the position of Personnel Counselor. (1979 Tr 281). The position was publicized by a posted announcement. (Dft's Ex. 4). Plaintiff was not promoted; he did receive a letter stating that he had not been selected for the position. (1979 Tr 282). Defendant contends that plaintiff was not considered eligible for the position because he did not submit any information showing that he had a

---

**5.** Plaintiff also contends, and I agree, that if I find defendant has discriminated against the plaintiff class, a *prima facie* case of discrimination is established as to individual class members. See *Franks v. Bowman Transportation*, 424 U.S. 747, 772, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1975). The evidence of plaintiff's individual claim, of course, is also relevant to the class action.

In addition to the evidence regarding the various administrative positions which he has sought during his employment with defendant, plaintiff also introduced evidence regarding an occurrence in March, 1978 when plaintiff was denied paid leave time from his job for time spent testifying before a Congressional committee. (1979 Tr 364–365). (There is no allegation made in the complaint that defendant discriminated by denying plaintiff paid leave

time, nor was such an allegation made to the EEOC).

**6.** Defendant was not covered by Title VII until March 24, 1972, when the Act was expanded to include state and local governmental employees. See *Hazelwood School District v. United States*, 433 U.S. 299, 309 n. 7, 97 S.Ct. 2736, 2739, 53 L.Ed.2d 768 (1976). Although discrimination prior to March, 1972 cannot be the basis of a claim of discrimination, I admitted this evidence as relevant to plaintiff's claim that defendant has engaged in a continuing practice of discrimination by denying promotions to plaintiff. (See 1979 Tr 275–277; see also *Hazelwood, supra*, 309 n. 15, 97 S.Ct. 2742). As is described in the text, however, the record is inconclusive with regard to positions plaintiff testified he applied for prior to 1972.

Master's or Doctor's degree from an accredited college or university in the field of guidance, counseling, or social work, which was one of the posted qualifications for the position. (Dft's Ex. 4). The evidence on what information plaintiff submitted with his application is again contradictory and inconclusive. Defendant bases its claim that plaintiff's application did not show that he had a degree in social work on the fact that it did not find a candidate folder for plaintiff for the position of Personnel Counselor in its files (1979 Tr 81). Plaintiff contends that he has a degree in social work from Masaryk University in West Germany, and that he indicated this on his application in 1964. (1979 Tr 387). Neither party submitted a copy of the application. Again, the only pertinent documentary evidence is plaintiff's personnel file (Plt's Ex. 40), which does not indicate that plaintiff has a degree in social work. Additionally, while plaintiff did show that he had obtained a doctoral degree from Charles University in Prague, Czechoslovakia, that degree was not in the field of guidance, counseling or social work; and plaintiff, at no point, contended that this had been indicated on his application. On his application for teacher in 1957, plaintiff listed "post–graduate" as the "specific degree" attained from Masaryk University. (Plt's Ex. 40). Plaintiff has not established that he submitted documentation which indicated that he was qualified for Personnel Counselor and, thus, no *prima facie* case has been shown as to this position.

In 1970 plaintiff applied for and was given a promotion in 1971 to the position of head of the Social Studies Department at Chadsey High School. (1979 Tr 288). He has held that position up to the present.

In 1974 plaintiff applied for the "eligibility pool"[7] being created for the position of Secondary Assistant Principal. (1979 Tr 294). The position was publicized by a posted announcement. (Dft's Ex. 5). Plaintiff met the posted "objective" qualifications, i.

e., education and experience. He was not selected for the eligibility pool because he was ranked below other candidates, based on a subjective evaluation of the candidates' ability and potential for the position.

Plaintiff testified that in 1975 he applied for the eligibility pool being created for the position of Region Assistant Superintendent, (1979 Tr 300), in response to a posted announcement. (Dft's Ex. 6). Plaintiff submitted some evidence supporting his claim that he sent in an application for the position. Plaintiff's Exhibit 21 is a letter of application for the position indicating plaintiff's interest in applying for the position. In addition, a fellow teacher with plaintiff at Chadsey High School, Albert Rosen, testified that he witnessed plaintiff place the application in the mail. (1979 Tr 672). Nonetheless defendant contends that it never received an application for this position from plaintiff, based on the fact that it has no application from plaintiff in its files. (1979 Tr 525). There is no evidence that defendant received or acted upon an application from plaintiff for Region Assistant Superintendent; plaintiff did not submit a copy of the application he claims was mailed to the Office of Personnel in 1975. Nor did plaintiff subsequently inquire regarding the status of his application when he received no acknowledgment or response to it from defendant. (1979 Tr 410). These facts lead to the conclusion that defendant may have lacked efficient administrative procedures and that plaintiff did less than he could have to insure that his application was received and processed. But I do not find any basis on the record to leap from that conclusion to a conclusion that there is here some evidence of discrimination against plaintiff.

Plaintiff testified that in April, 1975 he was "invited to apply" for the position of Deputy Superintendent. (1979 Tr 304). He testified that the invitation came from the President of the Board of Education and was apparently intended to attract the sup-

---

7. An "eligibility pool" is created as the first step in defendant's selection process to fill most administrative positions. The method of

selecting an eligibility pool and defendant's promotion process is described in detail in Part II, as part of defendant's rebuttal.

port of the Slavic community for the school system's first black superintendent[8]. Although plaintiff did not complete any formal application form for the position of Deputy Superintendent, he did "apply" for the position in a manner consistent with the invitation of the President of the Board of Education and with the way persons generally made their names known for this executive staff position. (1979 Tr 111). In response to the invitation by the President of the Board of Education, plaintiff was recommended for Deputy Superintendent by representatives of Slavic community groups. (Plt's Ex. 21). Beyond receiving the recommendation of people in the community, there is no established procedure for application or selection of persons for the position of Deputy Superintendent. Although plaintiff was invited to apply by the President of the Board of Education, the new Superintendent did not recommend him to the Board of Education and he was not promoted to the position. (1979 Tr 203).

Plaintiff testified that in November, 1975 he applied for the eligibility pool being created for the position of Junior Administrative Assistant in the Office of Personnel[9]. (1979 Tr 309). The position was publicized by a posted announcement. (Dft's Ex. 7). Plaintiff testified that the position is at the same level as the position he holds, and therefore was a lateral move and not a promotion. (1979 Tr 310). Despite the fact that this was not a promotion, he was not selected for the position. He was again ranked below other candidates on the basis of subjective evaluations of the candidates' abilities and potential for the position.

Plaintiff testified that in 1978 he applied for the eligibility pool being created for the

position of Director of the Equal Employment Opportunity Department. The position was posted. (1979 Tr 317). Plaintiff was again not selected for the position because he was ranked below other candidates in the "subjective evaluation" stage of the selection process.

Plaintiff's *prima facie* case is bolstered by three factors. First, plaintiff appears to be highly qualified to be a school administrator in light of his academic credentials and experience in the educational field. His education includes a doctorate from Charles University in Prague, Czechoslovakia, post–doctoral study at Masaryk University in Ludwigsburg, West Germany, and a Master of Arts degree from Wayne State University in Detroit. (1979 Tr 259–261; Plt's Ex. 40). He has had a variety of teaching and administrative experiences in the field of education. He began his career as a teacher at DeMaas Gymnasium in Czechoslovakia. (1979 Tr 261). After World War II, he served as an official in the Czechoslovakian government's ministry of education, with responsibility for developing vocational schools for the country's porcelain and glass industries. (1979 Tr 261). In 1949, after he escaped from imprisonment by the communist government which had taken over in Czechoslovakia, he was employed by the United Nations, with responsibility for developing educational programs for children in refugee camps in the United States zone in Germany. (1979 Tr 262). In 1952 he came to the United States and taught at a school in New Jersey. In 1953 he moved to Detroit to attend Wayne State University and worked as a district executive for the Catholic Youth Organization of the Detroit diocese. (1979 Tr 265). In 1956 he began substitute teaching in the Detroit Public

---

**8.** Plaintiff: "Dr. Golightly informed me that there would be a change in the administration with a new Superintendent, and he indicated that they expected to have the first Black Superintendent in the school system . . . (Dr. Golightly) said: 'We are going to have the first Black Superintendent in the Detroit history. It would be nice to have the first Slavic Deputy Superintendent.'" (1979 Tr 305, 306).

**9.** Plaintiff did not allege that he was denied promotion to Junior Administrative Assistant

or to Director of the Equal Employment Opportunity Department, see below, in his EEOC complaint, since the selection for these positions occurred after he filed his complaint with the agency. Although these specific allegations were not presented to the EEOC, they are "like or reasonably related to" the allegations investigated by the EEOC and therefore may be made a part of this judicial proceeding. See *Oubichon v. North American Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir, 1973).

Schools and in 1957 was appointed full–time to the teaching staff at Chadsey High School. He has been employed continuously by the Detroit Board of Education since 1957.

Second, plaintiff has been an outspoken advocate on behalf of the Slavic community and its concerns about the treatment of Slavic persons by the Detroit Board of Education. He was involved in the series of presentations and meetings between representatives of the Slavic community and the Board of Education between 1971 and 1976, at which the representatives of the Slavic community complained about the Board's treatment of Slavic employees. (See note 3, *supra*). An individual's national origin, unlike his or her race or sex, is not always conspicuous; the likelihood that an individual was discriminated against on the basis of his or her national origin is increased if that individual's national origin is well–known and conspicuous.

▮ Third, plaintiff was rejected for the positions of Secondary Assistant Principal, Deputy Superintendent, Junior Administrative Assistant and Director of the Equal Employment Opportunity Department, based on subjective evaluations and criteria. The potential dangers of subjective criteria in the promotion process were noted in *Rogers v. International Paper*, 510 F.2d 1340 (8th Cir, 1975), vacated on other grounds, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29, reinstated with modification on other grounds, 526 F.2d 722 (8th Cir, 1975):

> Greater possibilities for abuse . . . are inherent in subjective definitions of employment selection and promotion criteria. Yet they are not to be condemned

as unlawful *per se*, for in all fairness to applicants and employers alike, decisions about hiring and promotions in supervisory and managerial jobs cannot realistically be made using objective standards alone. Thus, it is especially important for courts to be sensitive to possible bias in hiring and promotion process arising from such subjective definition of employment criteria.

Employment decisions which rely heavily on subjective evaluations are suspect and "must be closely scrutinized because of their capacity for masking unlawful bias." *Davis v. Califano*, 613 F.2d 957, 965 (DC Cir, 1980); see also *Senter v. General Motors Corp.*, 532 F.2d 511, 529 (6th Cir, 1976). In addition, defendant's contention that plaintiff was not selected for the positions of Secondary Assistant Principal, Junior Administrative Assistant and Director of the Equal Employment Opportunity Department because other candidates who were "better qualified" (based on subjective evaluations) for the positions were selected is properly raised in defendant's rebuttal. Plaintiff does not carry the burden as part of his *prima facie* case of showing that he was the "best qualified" candidate for the position. See *Abrams v. Johnson*, 534 F.2d 1226 (6th Cir, 1976).

▮ Based on this evidence I conclude that plaintiff has established a *prima facie* case of discrimination as to the following positions applied for: Secondary Assistant Principal in 1974, Deputy Superintendent in 1975, Junior Administrative Assistant in the Office of Personnel in 1975, and Director of the Equal Employment Opportunity Department in 1978 [10].

---

**10.** Cf. *McDonnell Douglas v. Green*, 411 U.S. 792, at 802, 93 S.Ct. 1817, at 1824, 36 L.Ed.2d 668 (1972) (*prima facie* case is established where plaintiff shows "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications"); *Abrams v. Johnson*, 534 F.2d 1226 (6th Cir, 1975) (holding that plaintiff had established a *prima facie* case by showing that she had been passed over for promotion twice after receiving the highest score on a civil service merit rating, despite the fact that the employer's promotion procedure did not require that the person with the highest rating be selected for the position). I also note that at trial plaintiff testified that he sought two other positions but did not receive them: Assistant Superintendent for Community Relations in 1971 (1979 Tr 289) and "acting principal" of Chadsey High School in 1979 (1979 Tr 324). In the post–trial papers, plaintiff does not allege that defendant's failure to

## II. *Defendant's Rebuttal*

In rebuttal, defendant contends that plaintiff was not selected because other, better qualified persons were selected under the procedure used by defendant in filling vacancies in administrative positions. Defendant's rebuttal evidence consists largely of a description of the selection process it uses to fill each of the administrative positions plaintiff applied for.

The first step in the process of selecting a person to fill most administrative positions in the Detroit Public Schools is the creation of an "eligibility pool" for the position. Plaintiff was not selected for the eligibility pools created for Secondary Assistant Principal, Junior Administrative Assistant, and Director of the Equal Employment Opportunity Department. The position of Deputy Superintendent is not filled from an eligibility pool; persons are selected for this position by a different procedure discussed separately below.

The creation of an eligibility pool is publicized by posted announcements. (See Dft's Ex. 3–7; 1979 Tr 294, 300, 310, 317). The announcement contains the required "objective" qualifications for the position, i. e., education and experience, and also lists the "Duties and Responsibilities" of the position. The announcement also states that interested persons should send a letter of application to the Office of Personnel. (See Dft's Ex. 3–7). Upon receipt of the letter, an application form is sent by the Office of Personnel to the applicant. (1979 Tr 76). The application form consists of six pages. (See Dft's Ex. 1, 2). It requests the applicant to list his or her education and employment history and other professional and community interests and activities. The final page of the application, called the "Candidate's Page", requests the applicant to "indicate briefly plans you would wish to carry forward if opportunity is offered you in the position for which you are applying . . . and to briefly state some of the methods you would utilize to achieve these objectives."

Following receipt of the application, the Office of Personnel reviews the applicant's personnel file and application to determine whether he or she meets the posted qualifications for the job. (1979 Tr 503). Those whose application and personnel files indicate that they do not meet the posted qualifications as to education and/or experience are rejected and they are so notified. (1979 Tr 79) [11].

Depending on the position for which the eligibility pool is being created, this procedure may result in a list of from 50 to 300 qualified candidates. (Dft's Ex. 21; 1979 Tr 90, 522). The eligible candidates are then ranked by a selection committee appointed specifically to rank the candidates for the particular position.

The composition of the selection committee is critical. The members of the selection committee are appointed by the Superintendent of the Detroit Public Schools on the recommendation of the Office of Personnel. (1979 Tr 561). The committees are composed of five members. They generally include a representative of the Office of Personnel, a person currently holding the position for which the eligibility pool is being created, and a person currently holding the position who would be the immediate supervisor to the position for which the pool is being created. (1979 Tr 562). Thus the selection committee for the eligibility pool created for Secondary Assistant Principal included a secondary school principal and an assistant principal. (1979 Tr 564, 641). The Office of Personnel attempts to

appoint plaintiff to those positions was discrimination. Neither position was ever created or filled (1979 Tr 294, 324), thus I find there was no discrimination involved in not selecting plaintiff.

11. I note that it is not contended in either the individual or class action that any of the "objective" qualifications pertaining to education or experience are illegal because it dispropor-

tionately excludes persons of Slavic national origin and does not "bear a demonstrable relationship to successful performance of the jobs for which it was used." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1970). Plaintiff Sklenar claims he met the posted qualification for each of the positions he sought.

balance the selection committee in terms of race and sex. (1979 Tr 115). I note that relating to the claims in this case, no specific effort is made to include a person of Slavic national origin on each selection committee. (1979 Tr 117). On the other hand, it is clear that persons of Slavic national origin are not excluded from serving on the selection committees, and two of the committees which evaluated plaintiff included a person of Slavic national origin. (1979 Tr 599, 642).

Prior to the evaluation of candidates, the members of the selection committee and persons from the Office of Personnel meet to review the criteria to be used in evaluating the candidates. (1979 Tr 519). These criteria, as articulated at trial, are "ability to relate; establish rapport with students, community members, parents; ability to organize in some kind of sequential fashion; supervisory and evaluations skill with staff . . . We also try to identify a level of awareness, of consciousness—trying to evaluate people for school leadership positions in 1971 may be quite different than the kind of criteria we would emphasize in 1974, which would also be quite different from the emphasis we place in 1979." (1979 Tr 518).

The selection committee may or may not interview each candidate. As the procedure relates to this case, the selection committee for the eligibility pool for Assistant Secondary Principal did not interview the approximately 300 candidates. (1979 Tr 522). The ranking of the candidates was done on the basis of the candidates' applications, personal references indicated by the candidate on the application, and "candidate rating forms" completed by each candidate's administrative supervisors. (1979 Tr 522–523). The "candidate rating forms" (which indicated the candidate's supervisor's "estimated judgment of the candidate's potential for the position applied for" [Dft's Ex. 11]) were given the most weight. (1979 Tr 555).

The selection committee for the positions of Junior Administrative Assistant and Director of the Equal Employment Opportuni-

ty Department conducted interviews of the candidates. (1979 Tr 311, 317). On the basis of the interview, the "candidate rating forms" received from each candidate's administrative supervisor, and the candidate's application, each member of the selection committee graded each candidate from 1 to 10, with 10 being the highest rating. (1979 Tr 622; Dft's Ex. 18). The individual committee members' ratings were then tallied and the candidates ranked according to their respective scores. (1979 Tr 621).

The ranked list of candidates is then given to the Office of Personnel. When the eligibility list is for only one position, such as Junior Administrative Assistant in the Office of Personnel or Director of the Equal Employment Opportunity Department, the top–ranked person is selected for the position and the next–highest ranked persons may "be kept in an eligibility status in the event that a similar job or that position reopened." (1979 Tr 109–110). When the eligibility list is for a position in which a number of vacancies occur, such as Secondary Assistant Principal, an appropriate number is determined as the cut–off, and those persons ranked higher than that number become the "eligibility pool." (1979 Tr 98). The eligibility pool for Secondary Assistant Principal included the top 75 ranked candidates. (1979 Tr 516; Dft's Ex. 15). The names of the persons selected for the eligibility pool are then published in alphabetical order without ranking. (1979 Tr 105). Any person in the eligibility pool may be selected to fill a vacancy in the position. Thus, for example, a regional board of education, which appoints assistant principals in the schools in its region, may choose any of the persons listed in the eligibility pool. The regional board of education may promote a person directly from the eligibility pool or conduct its own selection procedure from among those who are in the eligibility pool and are interested in the specific position being filled. (1979 Tr 524).

Candidate rankings and the "candidate rating forms" from administrative superiors are kept confidential. (1979 Tr 505). However, candidates are given an opportunity

after the selection of the eligibility pool is complete to review the evaluations completed by the committee and his or her supervisors. (1979 Tr 586).

Although defendant's selection system requires that the final ranking of qualified candidates be based on subjective evaluations and criteria, the system has safeguards against unlawful bias on the part of those making the selection. Thus defendant's system does not have the same weaknesses noted by other courts in declaring that selection procedures which rely too heavily on subjective criteria are illegal. The creation of the eligibility pools is well publicized. See *Rowe v. General Motors*, 457 F.2d 348, at 359 (5th Cir. 1972); *Senter v. General Motors*, 532 F.2d at 528. The selection process is not wholly based on subjective criteria, the posted announcements state the required qualifications in terms of education and experience. See *Senter, supra*, at 529. There is no single individual who evaluates and ranks the candidates. See *Rowe; supra*, at 358. Criteria for selection are articulated and the persons who rank the candidates have clear knowledge of the skills and abilities necessary for the position. See *Rowe, supra*, at 358; *Rogers, supra*, 510 F.2d at 1346. In addition the candidates are given an opportunity to present their particular qualifications and abilities for the position, and subsequently to review the evaluations of them rendered by others.

The selection system is not illegal merely because every selection committee does not include a person of Slavic national origin. There is no evidence that defendant discriminatorily excludes Slavic persons from serving on selection committees. See *Rowe, supra*, at 359. Significantly, the evidence shows that plaintiff was not selected as the best qualified candidate by members of the selection committees who were of Slavic national origin. (1979 Tr 603, 564).

In support of defendant's contention that plaintiff's low rankings were not a result of a bias on the part of the selection committee but were based on legitimate considerations, defendant submitted evidence indicating the reasons for plaintiff's low ranking in the selection process for Secondary Assistant Principal and Junior Administrative Assistant. When plaintiff applied for the position of Secondary Assistant Principal, he did not write anything on the "Candidate's Page" of his application. (Dft's Ex. 1). As noted, the "Candidate's Page" afforded the candidates an opportunity to indicate specific goals or abilities they would bring to the position. The "Candidate's Page" was particularly important in the selection process because no oral interviews were given. In addition plaintiff received consistently low "prognostic" ratings from his administrative supervisors. (Dft's Ex. 11, 12, 13). He also received low ratings from administrative supervisors with regard to the position of Junior Administrative Assistant (Dft's Ex. 19, 20). In addition, the selection committee for this position indicated that it gave low scores to plaintiff because "he didn't understand the nature of the position" and "failed to answer questions related to the position." (Dft's Ex. 18). This written evaluation was substantiated by two members of the selection committee who testified at trial. (1979 Tr 598–626). Both persons testified that plaintiff did not stress his personal goals and abilities which he would bring to the position, but emphasized that he should receive the position because of his representation of the Slavic community. (1979 Tr 605, 620).

Certain executive–level positions in the administration of the Detroit Public Schools, including the position of Deputy Superintendent, are not generally filled through the selection process described above [12]. These positions constitute the

12. In addition to Deputy Superintendent, these positions are assistant superintendents, executive directors, and divisional directors, as well as the Superintendent's administrative staff person. (1979 Tr 189, 197). Some of these positions have, in recent years, been filled using a selection procedure like that described above. (1979 Tr 112–113). The position of Deputy Superintendent, which plaintiff applied for in 1975, has not been filled by the formal selection process.

"cabinet" or top staff of the Superintendent and the Board of Education and are appointed directly by the Board on the recommendation of the Superintendent. (1979 Tr 188–189). Openings for these positions are not announced, though they are apparently widely known within the school system. (1979 Tr 309). There is no formal application procedure. Persons of the requisite qualifications "apply" by already being known by and having worked with the Superintendent, or by being recommended for these positions by groups in the community (1979 Tr 194). The Superintendent recommends a person for the position to the Board of Education [13]. The Board of Education makes the actual selection of the persons to fill the positions, and regularly accepts the Superintendent's recommendation. (1979 Tr 191).

In the spring of 1975 new, top–level administration, including a new Superintendent, was appointed for the Detroit Public Schools. There were three Deputy Superintendent positions in the administration. In April, 1975, the President of the Board of Education, after meetings with representatives of the Slavic community in Detroit, invited them to recommend a person for the position of Deputy Superintendent. (See p. 9, above). They recommended plaintiff Sklenar. (Plt's Ex. 10). The Board of Education, on the recommendation of the Superintendent, selected the persons to fill the three Deputy Superintendent positions. One Deputy Superintendent position was filled by the person already serving in the capacity. (1979 Tr 195). The other two Deputy Superintendents recommended by the Superintendent and accepted by the Board of Education were persons with whom the Superintendent had worked closely in previous administrative positions in the school system and "had personal knowledge of their capabilities." (1979 Tr 203). One of these persons was black, the other white. (1979 Tr 199).

There is nothing in the record that suggests that plaintiff was not selected because

of his national origin. The Superintendent recommended persons whose abilities were already known to him and, therefore, did not consider plaintiff. Clearly, an important qualification for the position of Deputy Superintendent is the ability to work closely with the Superintendent, to be compatible with him and to enjoy his confidence. The record thus supports defendant's claim that plaintiff was not appointed Deputy Superintendent in 1975 for legitimate, nondiscriminatory reasons, and not because of his national origin.

■ I conclude that defendant has successfully rebutted plaintiff's *prima facie* case by showing, by a preponderance of evidence as to each of the positions for which the *prima facie* case was established, that plaintiff was not selected because of legitimate considerations, and not because of his national origin. *Furnco Construction, supra,* 438 U.S. at 577, 98 S.Ct. at 2949.

I find that the reasons given by defendant for not selecting plaintiff were not mere pretexts for discrimination. I have already noted that defendant's selection procedure contains safeguards against the danger that employment decisions may be made on the basis of an unlawful bias masked by subjective criteria. Furthermore the record substantiates the reasons given by defendant for the low ranking plaintiff received from the selection committees for Secondary Assistant Principal and Junior Administrative Assistant, respectively. (See p. 18, above). Finally, my observations of plaintiff at trial and from the record lead me to conclude that, though he possesses "degree" qualifications, he lacks other abilities and qualities necessary for the positions of Secondary Assistant Principal, Deputy Superintendent, Junior Administrative Assistant and Director of the Equal Employment Opportunity Department. Even if I were to find that plaintiff had proved a *prima facie* case as to all positions for which he applied, I would nonetheless conclude that he was not qualified for the positions. Defendant was justi-

---

**13.** The more recent practice is that the Superintendent sends three names to the Board of

Education with his recommendation of one of the three persons. (1979 Tr 201).

fied, I find, in not promoting him. During his testimony, plaintiff showed that he lacks patience and understanding in dealing with other persons; he was frequently abrasive and unwilling to balance other viewpoints with his own. Plaintiff demonstrated a real lack of sensitivity to the changing racial character of the community and of the Detroit Public Schools, and of the particular understanding and abilities those changes required of administrators. (1979 Tr 427–428). More generally, he showed no particular awareness or leadership on any educational issue or problem facing the public schools of Detroit apart from the problems of the Slavic community. (See, e. g., Dft's Ex. 2, p. 6). A person's race or his national origin does not qualify him.

For the reasons stated, plaintiff's individual claim of discrimination is denied.

### The Class Action

In the class action, plaintiff alleges that defendant discriminated against employees of Slavic national origin with respect to hiring and promotion. Plaintiff alleges both "disparate treatment" and "disparate impact" claims.[14] Plaintiff relies heavily on statistical evidence to show that persons of Slavic national origin are substantially underrepresented on the teaching and administrative staffs of the Detroit Public Schools. While asserting that this statistical evidence is alone sufficient to establish a *prima facie* case of discrimination, plaintiff also asserts that the statistical underrepresentation of Slavic persons is explained by defendant's "balance of staff policy [which], by design and implementation, has a disparate impact on the plaintiff class." (Plt's Brief in Support of Proposed Findings, p.

32). In addition plaintiff relies on the individual testimony of two members of the class as evidence that the class of employees of Slavic national origin has been disparately treated by defendant.

### I. The Statistical Evidence

A. *Plaintiff submitted the following statistical evidence :*

1. Approximately 24.1%–364,754 out of 1,511,322–of the population of the City of Detroit is of Slavic national origin. (Plt's Ex. 1).

2. The number of Slavic persons holding administrative positions of the level of assistant principal and higher in the Detroit Public Schools was, during 1973–74, 36 out of 928 administrators (3.9%); during 1974–75, 36 out of 887 administrators (4.0%); during 1975–76, 35 out of 901 administrators (3.95%). (Plt's Ex. 2).

3. The number of Slavic persons holding administrative positions of principal and above in the Detroit Public Schools in the school year 1977–78 was 22 out of 658 administrators (3.3%). This included 5 of 204 elementary school principals, 1 of 64 middle school principals, 0 of 23 high school principals, 6 of 141 regional administrative personnel, and 10 of 22 central office administrators. (Plt's Ex. 3).

4. The number of teachers employed by defendant who were of Slavic national origin was, in 1976, 790 out of a total teaching staff of 10,391 (7.6%); in 1977, 770 out of a total teaching staff of 9,852 (7.8%); in 1978, 838 out of a total teaching staff of 10,898 (7.6%). (Plt's Ex. 68).

5. During the years 1976–1978, 2,899 persons applied for employment as teachers

14. "'Disparate treatment' . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. . . . Claims of disparate treatment may be distinguished from claims that stress 'disparate impact.' The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. . . . Proof of discriminatory motive, we have held, is not required under a disparate–impact theory. . . . Either theory may, of course, be applied to a particular set of facts." See *Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1976).

with defendant. Of this number, 142 of the applicants (4%) were of Slavic national origin. (Plt's Ex. 68).

6. Approximately 8.8% of first generation Slavic–origin persons in the United States achieve a college degree, compared to 9.9% of the general population of the United States which achieve a college degree. (1978 Tr 168).

Plaintiff's statistics came from three sources: a report on National Origin and Language by the United States Bureau of the Census based on its 1970 census of the population (Plt's Ex. 1A), a 1975 survey by Wayne State University (Plt's Ex. 1B), and the directories and lists of the employees of the Detroit Public Schools. (Plt's Ex. 2A, 3A).

Plaintiff's figures as to the national origin composition of the population of Detroit are calculated from the 1970 census statistics and the Wayne State University study. The 1970 census statistics indicate the number of persons "native of foreign or mixed parentage" from the various Slavic countries residing in the Detroit Standard Metropolitan Statistical Area (SMSA). (Plt's Ex. 1, pp. 206–207). This category includes only persons who are foreign born and have immigrated to the United States. (1978 Tr 41). By adding the figures for the various Slavic countries, plaintiff found the total number of first generation Slavic persons in the Detroit SMSA. By using the Wayne State University survey, plaintiff was able to determine the percentage of these immigrants living in Detroit versus the percentage living in the surrounding suburban area. (Plt's Ex. 1B, Table 5; 1978 Tr 42). The Wayne State University survey also shows the percentage of persons of various national origin groups (as defined by their "mother tongue"), who are first, second and third generation. Since the number of Slavic immigrants (first generation) living in Detroit was known, the number of Slavic persons of second and third generation Slavic persons (again, as defined by their "mother tongue") could be calculated based on the percentage of the total number who are first generation.

The definition of persons of Slavic national origin used to arrive at the figure of 24.1% does not coincide precisely with the definition of the national origin group used in the certification of the class. The definition used to calculate the 24.1% does not include persons born in the United States whose parents or grandparents were born in one of the Slavic countries, but who do not themselves regard a Slavic language as their major language ("mother tongue"). (See 1978 Tr 49). Thus, whatever overlap exists would increase the 24.1% figure.

The figures as to the percentage of Slavic immigrants who attain a college degree were also calculated from the 1970 census figures. (1978 Tr 163–168).

Figures as to the percentage of defendant's employees who are of Slavic national origin are based on the directories and lists of employees maintained by defendant. Defendant does not keep records of the national origin composition of its work force. (Stipulation, Joint Pretrial Statement, p. 2). The number of Slavic persons in the employee group was determined by the employees' last names. Dr. Joseph Wrytrwal, who testified that he could identify Slavic surnames with 95% accuracy (1978 Tr 59), reviewed the directories and identified those employees with Slavic surnames. The percentage of employees of Slavic national origin was then calculated using this definition. Similarly, the number of applicants for teaching positions who were of Slavic national origin was determined from the applicants' surnames.

The number of employees of Slavic national origin as calculated by this method may vary significantly from the number of employees of Slavic national origin as defined by my order of class certification. Plaintiff's list of Slavic employees, for example, may include persons who are not themselves of Slavic national origin but have taken a Slavic surname through marriage. Similarly the list may include persons with Slavic surnames whose ancestry came to the United States before their parents or grandparents were born.

Plaintiff is not "at fault" for not submitting more accurate statistics. The statistics submitted on the national origin composition of Detroit and the administrative and teaching staffs of the Detroit Public Schools appear to be the most reliable statistics readily available, since neither the U. S. Bureau of Census nor defendant has historically maintained records on ethnic identity.[15]

B. *The Weight of the Statistical Evidence*

There is no doubt that statistics can be probative evidence of discrimination and may alone, in a proper case, establish a *prima facie* case of discrimination. *Teamsters v. United States*, 431 U.S. 324, 339, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1976). Nonetheless the probative weight of the statistical evidence in any case must be closely examined because the "usefulness [of statistics] depends on all of the surrounding facts and circumstances." *Teamsters, supra*, at 340, 97 S.Ct., at 1856.

In summary, plaintiff's statistical evidence compares three percentages: the population of the community, which is 24.1% Slavic; the teaching staff of the Detroit Public Schools, which is 7.6% Slavic; and the administrative staff of the Detroit Public Schools, which is 3.3–4.0% Slavic.

The United States Supreme Court has made it clear that the probative weight of statistical comparisons between the composition of the community and the composition of the employer's work force depends on whether special qualifications are required to fill the positions on the employer's work force.

In *Teamsters [supra* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396] the comparison between the percentage of Negroes on the employer's work force and the percentage in the general areawide population was highly probative, because the job skill

there involved—the ability to drive a truck—is one that many persons possess or can readily acquire. When special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value. *Hazelwood School District v. United States*, 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742, n.13, 53 L.Ed.2d 768 (1976).

In *Hazelwood, supra* at 308, 97 S.Ct. at 2742, the Supreme Court stated that, where the underrepresentation of black faculty members was alleged, "a proper comparison was between the racial composition of Hazelwood's teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market." The Supreme Court noted that proof showing the actual percentage of white and black applicants for teaching positions at Hazelwood would be "very relevant", but left to the District Court to determine whether competent proof of such data could be adduced. *Hazelwood, supra*, at 308 n. 13, 97 S.Ct. at 2741.

The allegation here is that Slavic persons are underrepresented on the teaching staff and in the administration (of the level of assistant principal and above) of the Detroit Public Schools. These positions require specialized qualifications—at a minimum, a college degree and a teaching certificate—and therefore comparisons between the composition of the teaching and administrative staffs and the composition of the community have little probative value. What is important, for this comparison, is the number of persons of Slavic national origin in the community who possess the requisite qualifications to be teachers and administrators.

---

**15.** In the 1980 census a question on ethnic identity was included and the data from the census will be available.

The problem faced by plaintiff in finding accurate, reliable data on ethnic identity from which to build statistical evidence of discrimination is common to plaintiffs alleging discrimination based on national origin. See Munafo, National Origin Discrimination Against Americans of Southern and Eastern European Ancestry, 25 *Catholic Lawyer*, 50–72 (Winter, 1979).

Plaintiff is aware of this weakness in the statistical proof and responds with three arguments. First, plaintiff contends, most administrators in the Detroit Public Schools are hired or promoted from the teaching staff of the Detroit Public Schools. Thus, the comparison between the percentage of administrators who are of Slavic national origin (3.3–4.0%) and the percentage of teachers who are of Slavic national origin (7.6–7.8%) is probative evidence of discrimination in the hiring of administrators.

There is some evidence on the record that indicates that most administrators in the Detroit Public Schools are hired from the teaching staff. Most of the administrators who testified at trial began their employment with the Detroit Board of Education as teachers. (1978 Tr 54; 1979 Tr 4, 133, 266, 600). However, not all teachers have the qualifications required for administrators. The additional qualifications required of administrators vary from position to position. The Secondary Assistant Principal position requires a Master's degree with graduate study in secondary school administration, supervision, curriculum and guidance. (Dft's Ex. 5). Region assistant superintendents must have a Master's degree and some school–related administrative experience. (Dft's Ex. 6).

Even assuming that the comparison between the percentage of administrators who are Slavic and the percentage of teachers who are Slavic is a proper comparison to show discrimination in the hiring of admin-

istrators, the disparity shown–between 7.6%–7.8% and 3.3%–4.0%–is not as substantial as that relied on by the courts to establish a *prima facie* case of discrimination.[16]

Second, with regard to the percentage of the teaching staff which is of Slavic national origin, plaintiff contends that since there are no competent records kept as to the national origin composition of the qualified public school teacher population in Detroit, I should accept the "next best" evidence. The "next best" evidence submitted are statistics calculated from the 1970 census showing that persons of Slavic national origin in the United States achieve college degrees in approximately the same percentage as the general population of the United States. (See p. 23, above). These statistics, plaintiff contends, suggest that the national origin composition of the qualified public school teacher population approximately mirrors the national origin composition of the community.

I note only two problems with plaintiff's theory. First, as was stated by plaintiff's witness, Dr. Wrytrwal, at trial, the Slavic community in Detroit supports many Catholic and private schools (1979 Tr 489); it is not unlikely that many of the qualified teachers of Slavic national origin do not apply with the Detroit Public Schools but choose to teach in local Catholic schools. Second, there is evidence on the record, introduced by plaintiff, that only 4% of the actual applicants for teaching positions in

**16.** The disparity necessary to establish a *prima facie* case by statistics alone is unclear. In relatively few cases have courts actually relied solely on statistical evidence in determining that a *prima facie* case was established. See, e. g., *Teamsters, supra,* 431 U.S. at 338, 339, 97 S.Ct. at 1855, 1856; *League of United Latin American Citizens v. City of Santa Ana,* 12 FEP Cases 651, 655 (CD Cal, 1976) (cited at p. 31 of plaintiff's Brief in Support of Proposed Findings). See also *EEOC v. Detroit Edison,* 515 F.2d 301, 313 (6th Cir, 1975) and *Mabin v. Lear Siegler,* 457 F.2d 806 (6th Cir, 1972). Nonetheless in none of the cases cited by plaintiff on page 31 of the Brief in Support of Proposed Findings for the proposition that the disparity here is substantial enough to establish a *prima facie* case is the disparity as small as the disparity between 7.6–7.8% and 3.3–4%. The

closest, among the cases cited, in terms of the ratio between the "expected" and the "actual" values was in *Reed v. Lucas,* 11 FEP Cases 153 (ED Mich, 1975). In that case the disparity between 27% blacks in the population of the community and 10% blacks in the work force was substantial enough to defeat a preliminary motion of dismissal. Finally, I note that, using the statistical methodology explained by the Supreme Court in *Hazelwood, supra,* 433 U.S. at 311 n. 17, 97 S.Ct. at 2743, and *Castaneda v. Partida,* 430 U.S. 482, at 496–497 n. 17, 97 S.Ct. 1272, at 1281, 51 L.Ed.2d 498 (1976), the difference between the expected and the actual percentages of Slavic administrators, using 7.6–7.8% and 3.3–4%, is less than one standard deviation and thus does not "undercut the hypothesis that decisions were being made randomly" with respect to national origin.

the Detroit Public Schools from 1976–1978 were of Slavic national origin. (Plt's Ex. 68).

Plaintiff's third response to the *Hazelwood* "problem", i. e., showing the availability of qualified persons in the labor market, is that the burden of showing the unavailability of qualified persons of Slavic national origin is on defendant. Plaintiff argues that *Hazelwood, supra,* did not address the question of which party has the burden of proving the availability or unavailability of qualified persons. Plaintiff contends that those courts which have considered the question have placed the burden on defendant to show that qualified persons were not available. In support, plaintiff cites *U. S. v. Hayes International,* 456 F.2d 112, at 120 (5th Cir. 1972); *EEOC v. Radiator Specialty Co.,* 20 FEP Cases 704, at 711 (WD NC 1978); and *Kaplan v. Theatrical Workers,* 525 F.2d 1354 (9th Cir. 1975).

In *Hayes, supra,* the Court of Appeals cited statistics showing that the employer employed 918 whites and 6 blacks in office and technical positions, compared to the population of the community which was approximately 30% black. The Court of Appeals stated

> These lopsided ratios are not conclusive proof of past or present discriminatory hiring practices; however, they do present a *prima facie* case . . . At this stage of the proceedings it was not necessary for the Attorney General to show the availability of skilled negroes in the community to perform the jobs in question because the burden of going forward and showing the lack of qualified negroes was upon *Hayes.* (at 120).

In *Kaplan, supra,* the Court of Appeals stated that

> Once the inference of discrimination arises from proper statistical proof, it is defendant's burden, not plaintiff's, to show the lack of qualified female still photographers in the Los Angeles area. (citing *Hayes,* at 1358 n.1).

Similarly in *EEOC v. Radiator Specialty,* 20 FEP Cases 704, 711, the court determined that a *prima facie* case was established and asserted in its conclusions that the employer had not effectively rebutted the *prima facie* case by showing that "the figures for the general population and its own work force might not reflect the pool of qualified applicants for these white collar positions."

These cases do not support plaintiff's contention that plaintiff has met its burden of a *prima facie* case based on the statistics submitted. The cases merely assert that once a *prima facie* case has been established, the burden of rebutting the statistical evidence shifts to the employer. See *Croker v. Boeing Co.,* 437 F.Supp. 1138, 1183 (ED Pa., 1977). As to what the probative weight of the statistical evidence submitted towards establishing a *prima facie* case is, *Hazelwood* is controlling.[17]

█ I conclude that plaintiff's statistical evidence does not establish a *prima facie* case of discrimination. Although a reasonable approximation of the percentage of Slavic persons on the teaching and administrative staffs of the Detroit Public Schools has been shown, plaintiff has not submitted evidence sufficient for me to infer that a substantially higher percentage of qualified Slavic persons has applied or wishes to apply for these positions.[18]

---

17. The obvious result of plaintiff's argument would be that all or nearly all of the burden of proof in a Title VII case would be on the employer–to prove that it has not discriminated. Plaintiff would need only to alleged discrimination and show "some evidence" that plaintiff's racial/ethnic/sex group is "underrepresented" in the work force. That result is not consistent with the opinions of the United States Supreme Court requiring plaintiff to produce *evidence* sufficient to draw an inference that the employer has discriminated. *McDonnell Douglas, supra,* 411 U.S. at 802, 93 S.Ct. at 1824, *Team-*

sters, *supra,* 431 U.S. at 336, 97 S.Ct. at 1854; *Hazelwood, supra,* 433 U.S. at 303, 97 S.Ct. at 2739; *Furnco Construction, supra,* 438 U.S. at 576, 98 S.Ct. at 2949.

18. Relating to the statistical evidence is another issue which appeared in this case, although in unclear terms. Plaintiff seems to suggest that defendant's failure to keep records on national origin is itself discrimination. (Plt's Brief in Support of Proposed Findings, p. 38). Furthermore plaintiff claims, the fact that defendant's record keeping was in compliance

## II. *The Individual Testimony*

In support of the claims of the plaintiff class, two individual members of the class, Jan Sklenar and Joseph Wrytrwal, recounted incidents of alleged discrimination against them, regarding administrative positions which they sought but were denied. The testimony of Jan Sklenar is, of course, also evidence for his individual claim, and that has been discussed.

Joseph Wrytrwal's testimony establishes a *prima facie* case of discrimination based on national origin. Since 1973 Wrytrwal has been, and still is, principal of Wilson Middle School in Detroit. (1979 Tr 443). He has a number of degrees from various colleges and universities and has written and had published a long list of books and articles. (1978 Tr 54–56). At trial he recounted six administrative positions which he has sought but did not receive since 1973.[19] Only with regard to one of these positions does defendant contest Wrytrwal's contention that he properly applied and was qualified for the positions. The evidence shows that Wrytrwal submitted his credentials for the position of Principal of Osborn High School in 1976, after the deadline for submission announced by the Region 6 Board of Education and therefore was not considered for that position. (1979 Tr 644–645). A *prima facie* case of discrimination is established with regard to the five positions which Wrytrwal testified he applied for in 1977 and 1978 and which he did not receive.

Defendant contends that Wrytrwal was not selected for the positions he applied for because the respective regional boards, which made the selection for the position in its region, selected persons who were better qualified than Wrytrwal. Wrytrwal was eligible for each of these petitions because he was either in the eligibility pool for the position or the position sought was a "lateral transfer" from his middle school principalship. (1979 Tr 451, 454, 459). In selecting a person to fill the five positions Wrytrwal applied for, the respective regional board was restricted to choosing from among persons in the eligibility pool or who were seeking a lateral transfer. (1979 Tr 547). Thus, all such candidates were "qualified" in the sense of having the necessary education and experience. The regional board chose the individual it found to be the *best* qualified for the position from a list of eligible candidates. (1979 Tr 524, 547–548). With regard to each of the positions Wrytrwal applied for during 1977 and 1978, the respective regional board selected someone other than him. In his testimony, Wrytrwal contended that he was better qualified for the positions he applied for than the person selected because his academic credentials and years of experience as a school administrator were superior to those of the person selected. (1979 Tr 448, 466, 476). His testimony showed, however, that he lacked other abilities and qualities which are also important for a school administrator to have. He demonstrated an inflexibility which prevented him from considering other viewpoints than his own. (1979 Tr 476). He demonstrated a lack of familiarity with, and a lack of sensitivity to, the racial character of the Detroit Public Schools. (1979 Tr 475–476, 542).

No evidence was presented to prove that either because of a policy of defendant or because of personal bias, the regional boards considered Wrytrwal's national origin in not selecting him. In this regard, there is probative value in the fact that the

---

with requirements by the EEOC–which required defendant to maintain records only as to five categories: White, Black, Hispanic, Asian and American Indian (29 CFR 1602.3 *et seq.*)–is not a defense, since plaintiff asserts that the EEOC regulation on record keeping is unconstitutional. (Plt's Brief in Support of Proposed Findings, p. 39). The lack of record keeping may be evidence that national origin was not a concern of defendant in its personnel policies but it is not itself discrimination as to the

"terms and conditions of employment". 42 U.S.C. § 2000e–2(a).

19. The positions are Principal of Osborn High School in 1976; Region Assistant Superintendent of Region 3 in 1978; Region Assistant Superintendent of Region 4 in 1977; Superintendent of Region 5 in 1978; Region Assistant Superintendent of Region 6 in 1978; and Principal of Chadsey High School in 1978.

Region 6 Board, which included four persons of Slavic national origin (1979 Tr 646), did not choose Wrytrwal from the eligibility pool as one of the four persons it would consider for two vacancies for Region Assistant Superintendent in 1978. (1979 Tr 647). The Region 6 Board has chosen other Slavic persons to fill administrative positions, including the position of Region Superintendent. (1979 Tr 651–652).

Because of this, I conclude that defendant has shown by a preponderance of evidence that Wrytrwal was not selected for positions he applied for because of legitimate, nondiscriminatory reasons.

III.. *The Balance of Staff Policy and Disparate Impact*

Plaintiff's third argument in support of the class claim is that defendant's "balance of staff" policy is discriminatory on its face and has a discriminatory impact.

Plaintiff has maintained a balance of staff policy since 1965. (1979 Tr 14). The policy, as written in 1974[20], states that

The Balance of Staff Policy is designed to assure that the Detroit Public School System is continually moving toward integrated staff at all levels in all schools and other units throughout the system.

The Board of Education has frequently reaffirmed its commitment to the balanced staff concept under which teachers assigned to schools shall have the necessary qualifications to teach the subject area and grade level, and pupils shall have experiences with teachers and administrators of different races, and shall have both new and experienced teachers on a faculty which includes both men and women.

In order to implement the Balanced Staff Policy in filling vacancies and/or when a school's staff is increased or decreased, appropriate assignments or transfers will be made in the school department in which the change of service occurs, giving priority to the balanced staff concept elements in the following order: necessary qualifications to teach such area and grade level, race, experience, and sex.

As it relates to administrators, we have agreed . . . to review periodically all eligibility pools so that we are certain that such pools include a sufficient number of qualified candidates–Black and White, Male and Female, Experienced and Inexperienced–to permit a realistic choice in the selection of persons to fill vacancies.

The balance of staff policy, as it relates to the hiring and promotion of administrators in the school system, is implemented through the selection procedure described above. Initially, the Office of Personnel reviews the list of applicants for an eligibility pool to insure that the applicant list includes a balance as to blacks and whites and men and women. (1979 Tr 100). Similarly, after the eligibility pool is selected, the list of persons in the pool is reviewed to insure that it includes blacks and whites and men and women[21]. (1979 Tr 101).

Subsequently, when vacant positions are filled from among the persons who are in the eligibility pool, or who seek lateral transfer, defendant considers the race and sex of other administrators in the unit (e. g., high school) and the face and sex of the person to be appointed, in order to maintain a balance with regard to race and sex within the unit. (1979 Tr 19, 20). In order to insure that a balance is maintained, some vacancies are required to be filled by a person of a particular race and/or sex. Evidence was introduced as to one such position. In 1978, Region 6 had vacancies for the positions of Region Superintendent and one of two Region Assistant Superintend-

20. The policy was stated in written form in 1974 at the directive of the Wayne County Circuit Court. (1979 Tr 11). The court's directive did not result from a finding of discrimination; it resulted from a contract dispute regarding the nonplacement of administrators in schools (1979 Tr 15).

21. This applies to those positions for which a large eligibility pool is created, such as assistant principal and principal.

ents. The Region 6 Board promoted the incumbent Region Assistant Superintendent, a white male of Slavic national origin, to the position of Region Superintendent. (1979 Tr 642, 646). The Region 6 Board was then instructed by the Office of Personnel that one of the two Region Assistant Superintendent positions had to be filled by a minority person and one by a female. (1979 Tr 543–544). When the board chose a white male for one of the positions, it was then required to select from the list of qualified candidates a black female to fill the other position. (1979 Tr 544–647).

Plaintiff claims that defendant's balance of staff policy discriminates against persons of Slavic national origin in two ways. First, plaintiff contends, the implementation of the policy necessarily has a disparate impact on the plaintiff class. "[I]t is plaintiff's contention . . . that if an employer creates a system whereby some but not all protected classes of employees are preferred, then one who . . . is in a non–preferred class of employees is, by definition, denied such promotions, in part, by reason of their (sic) national origin. After all, there are only so many promotional openings at any place of employment, and if one class of protected employees are (sic) preferred over another, or mandated by the employer's policies to be placed in the position, the non–preferred class of employees will suffer discrimination in the form of underrepresentation, as the statistical proofs herein demonstrate." (Plt's Brief in Support of Proposed Findings, p. 18).

Second, plaintiff contends that defendant has discriminated against employees of Slavic national origin because the balance of staff policy does not give the same "preference" to them as it gives to blacks and women. (Plt's Brief in Support of Proposed Findings, pp. 32–37). Plaintiff does not contend that any "preference" on the basis

of race, sex, or national origin is illegal, but argues that a policy which extends the preference to blacks and women but not to national origin groups is discriminatory.[22]

■ The weakness in plaintiff's arguments is pointed up by an analysis of plaintiff's proofs. I find that plaintiff has not presented a *prima facie* case to support its assertions regarding the disparate impact of the balance of staff policy. By and in itself, the balance of staff policy is not evidence of discrimination. Even if I were to find, which I do not, that plaintiff has presented a *prima facie* case of disparate impact, because of defendant's design and implementation of the balance of staff policy, defendant has met that *prima facie* case by its showing that the individual members of the class, Sklenar and Wrytrwal, were not discriminated against by the balance of staff policy; defendant proved that they were not the best qualified candidates for the positions each applied for. Procedurally, this showing would then place the burden of going forward on plaintiff. Earlier, I found that the statistical evidence failed to show that there were qualified persons of Slavic national origin whom defendant failed to hire or promote, and I also found that plaintiff's assertion of statistical underrepresentation of Slavic persons is without merit. Thus, plaintiff, in order to show that the reasons advanced by defendant for not hiring or promoting persons of Slavic national origin are simply pretextual, must prove that members of plaintiff class were the best qualified persons to fill the positions applied for, but were bypassed for others less qualified because the policy mandated that such positions be filled with persons of a particular race or sex. Plaintiff did not introduce such evidence, and thus I conclude that members of plaintiff class were not denied positions through hire

---

**22.** Although plaintiff labels the balance of staff policy as a "preference" for blacks (Plt's Brief in Support of Proposed Findings, p. 34), I note that the policy could also give the same "preference" to white applicants, if the other positions in the particular school were held by blacks, or would give no preference to either

whites or blacks, if a balance was already attained. The historical purpose of the policy was to correct an imbalance with regard to race (1979 Tr 21), but presently the policy would apparently operate more rigidly to correct an imbalance in the sex composition of the administrative staff. (1979 Tr 551–552).

or promotion because of the balance of staff policy.[23]

IV. *Conclusion*

It is evident, as plaintiff has charged, that defendant Board of Education has not been concerned with the concept of national origin in its personal policies; its concern has been only with race and sex. This lack of concern for national origin is most obvious in two areas: the balance of staff policy, which emphasized race and sex, and defendant's failure to maintain records on the national origin of its employees. But Title VII is not violated by a "lack of concern" unless that lack of concern is translated into discriminatory actions by the employer. For the reasons stated, the evidence in this class action does not establish a *prima facie* case of discrimination. Plaintiff's claim of discrimination is therefore denied.

---

**23.** Thus, this case does not reach the issue faced by the United States Supreme Court in *United Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), and *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), whether proven discrimination suffered by the plaintiff is nonetheless permissible under Title VII and the Equal Protection Clause of the Fourteenth Amendment.